Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff: DUSTIN ANDERSEN

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DUSTIN ANDERSEN on behalf of himself and all similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>VIATOR, INC.; DELAWARE VIATOR, INC.,<br><br>Defendants. | Case No: 5:25-cv-1532 WLH (SKx)<br><br>**FIRST AMENDED COMPLAINT**<br><br>1. Cal. Penal Code § 638.51<br>2. Cal. Civil Code § 1798.100, *et seq.*<br>3. Cal. Bus. & Prof. Code § 17200, *et seq.*<br><br>**<u>CLASS ACTION</u>** |

## I. NATURE OF THE ACTION

1. Defendants VIATOR, INC. and DELAWARE VIATOR, INC. (collectively referred to herein as "Defendant" or "VIATOR") own and operate a website, www.viator.com (the "Website").

2. This is a class action lawsuit brought by Plaintiff on behalf of himself and on behalf of all California residents who have accessed the Website.

3. Plaintiff DUSTIN ANDERSEN files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant. Plaintiff brings this action based upon personal knowledge of the facts pertaining to him, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

4. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded or a user performs a tracked action.

5. When triggered, the pixel transmits data from the user's browser to a third-party server. This data typically includes page views, session duration, referrer URLs, IP address, browser and device details, and other interaction metadata.

6. When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Criteo Tracker
- AppNexus Tracker
- The Trade Desk Tracker
- Tapad Tracker
- Pubmatic Tracker
- Facebook Tracker
- TikTok Tracker

/ /

7. The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website as described herein for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies that go beyond Defendant's direct needs for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers."

8. The Trackers are operated by distinct third parties: Criteo S.A. (Criteo Tracker); Xandr Inc. (a Microsoft company) (AppNexus Tracker); The Trade Desk, Inc. (The Trade Desk Tracker); Tapad, Inc. (Tapad Tracker); PubMatic, Inc. (PubMatic Tracker); Meta Platforms, Inc. (Facebook Tracker); and TikTok Inc. (TikTok Tracker). Defendant enables these trackers, which transmit user data to third-party servers to identify users and support advertising, profiling, and data monetization activities.

9. Through the Trackers, the Third Parties collect detailed user information including IP addresses, browser and device type, screen resolution, operating system, pages visited, session duration, scroll depth, mouse movements, click behavior, referring URLs, unique identifiers (such as cookies and ad IDs), and geolocation based on IP. This information is used for behavioral profiling, ad targeting, cross-device tracking, and participation in real-time advertising auctions (collectively, "User Information").

10. Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device identifiers, and other non-content metadata, they function as "pen registers" and/or "trap and trace devices" under Cal. Penal Code § 638.50. These tools silently collect routing and addressing information for commercial use without user interaction, as defined in *Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023).

11. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their behavioral data to be disclosed or monetized in this way. By installing and using

the Trackers without prior consent and without a court order, Defendant violated CIPA section 638.51.

12. By installing and activating the Trackers without obtaining user consent or a valid court order, Defendant violated California Penal Code § 638.51, which prohibits the use of pen registers and trap and trace devices under these circumstances.

13. Defendant provides a "Privacy and Cookies Statement" on the Website (the "Privacy Policy") but does not conform to the Privacy Policy:

a. Defendant does not clearly disclose that real-time behavioral data is transmitted to third parties immediately upon site arrival;

b. Defendant represents that sensitive personal information is not used for inferring characteristics; however, search terms, page activity, and inferred interests are transmitted to platforms that use such data for profile building;

c. Tracking and third-party sharing occurs prior to presenting users with a valid choice to opt-out or manage consent;

d. Defendant claims data collection is limited to what is necessary to provide services or with consent; however, extensive behavioral data is collected on purely informational pages; and

e. Defendant omits material details regarding the depth of personal data shared with third parties and the nature of behavioral profiling activities.

14. Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents.

15. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

/ /

/ /

## II. PARTIES

16. Plaintiff DUSTIN ANDERSEN ("Plaintiff") is a California citizen residing in Riverside County and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred during the class period prior to the filing of the complaint in this matter including but not limited to April 1, 2025, and during which time Plaintiff submitted private information on the Website in order to complete a purchase from VIATOR in the amount of $189.00 with a credit card. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

17. Defendant VIATOR, INC. is a Delaware corporation that owns, operates and/or controls the Website which is an online platform that offers goods and services to consumers. Defendant DELAWARE VIATOR, INC. is a Delaware corporation registered with the California Secretary of State, with its foreign name being VIATOR, INC., that owns, operates and/or controls the Website which is an online platform that offers goods and services.

18. VIATOR is a leading online travel and tour booking platform owned by Tripadvisor, Inc. The company operates globally but maintains a strong online presence throughout the United States. Headquartered at 400 1st Avenue, Needham, Massachusetts, VIATOR allows users to search, compare, and book thousands of travel experiences and excursions in destinations worldwide.

19. VIATOR functions as a consumer-facing subsidiary of Tripadvisor's broader travel services ecosystem. While Tripadvisor operates a variety of brands, Viator is directly responsible for processing tour bookings, collecting customer data, and facilitating user interaction with local service providers. Through its platform, VIATOR gathers user information for purposes including transaction processing, behavioral profiling, and advertising, all of which implicate privacy compliance obligations under California and federal law.

/ /

20. The Website serves as VIATOR's primary digital platform. It enables users to browse travel experiences, compare prices, manage bookings, and engage with customer support. In addition to these operational roles, the site functions as a powerful vehicle for behavioral surveillance and targeted advertising. Through the deployment of third-party tracking technologies — including tracking pixels, event beacons, and behavioral monitoring scripts, the Website collects detailed user interaction data. These tracking practices are central to VIATOR's data monetization strategy and present serious implications under the California Invasion of Privacy Act (CIPA) and related privacy statutes.

## III. JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

22. This Court has personal jurisdiction over Defendant because, on information and belief, Defendant has purposefully directed its activities to the Central District of California by regularly engaging with individuals in California through its website. Defendant's illegal conduct is directed at and harms California residents, including Plaintiff, and if not for Defendant's contact with the forum, Plaintiff would not have suffered harm.

23. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District; and (4) the injury to Plaintiff occurred within this District.

/ /

## IV. GENERAL ALLEGATIONS

### 1. *The California Invasion of Privacy Act (CIPA)*

24. Enacted in 1967, the California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

25. CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order (Cal. Penal Code § 638.51(a)).

26. A "pen register" is defined as a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, excluding the contents of the communication (Cal. Penal Code § 638.50(b)).

27. Conversely, a "trap and trace device" captures incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, again excluding the contents (Cal. Penal Code § 638.50(b)).

28. In practical terms, a pen register records outgoing dialing information, while a trap and trace device records incoming dialing information.

29. Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing numbers dialed from a specific line and trap and trace devices recording incoming call numbers to that line.

30. Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record

the sender's email address, the recipient's email address, and the subject line—essentially capturing the user's outgoing information.

31. Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address, and the subject line—capturing the incoming information.

32. Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme (*In re Google Inc.*, 2013 WL 5423918, at *21; *Greenley*, supra, 2023 WL 4833466, at *15; *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1). This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations (*Matera v. Google Inc.*, 2016 WL 8200619, at *19).

33. The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy have long been actionable under common law. (*Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019); Eichenberger v. ESPN, Inc., 876 F.3d 979, 983 (9th Cir. 2017).)

34. Both the legislative history and statutory language indicate that the California Legislature intended CIPA to protect core privacy rights. Courts have found that violations of CIPA give rise to concrete injuries sufficient to confer standing under Article III. (See *Campbell v. Facebook, Inc.*, 2020 WL 1023350; *In re Facebook Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020).)

35. Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation (Cal. Penal Code § 637.2(a)(1)).

### 2. *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"*

36. When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP

response containing the necessary resources—including HTML, cascading style sheets (CSS), JavaScript files, and image assets—used by the browser to render and display the webpage. These resources also included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. ***Figure 1*** below illustrates sample HTTP requests.

***Figure 1***




37. The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data, typically via HTTPS requests, to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data (referred to as User Information) included identifiers such as IP addresses, device characteristics, browser types, page navigation behavior, and unique tracking cookies, all of which were used to profile users and facilitate targeted advertising.

38. The Trackers operate by initiating HTTP or HTTPS requests—using either the GET or POST method from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and device metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

39. An Internet Protocol (IP) address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.* (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (e.g., 191.145.132.123). IP addresses enable routing of data between devices and can be used via external geolocation services to infer a user's general location, including state, city, and in some cases, ZIP code.

40. Public IP addresses are unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access and can be used to approximate a device's physical location through geolocation services.

41. In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. They are isolated from the global Internet and can be reused across different networks without conflict. Unlike public IP addresses, private IP addresses do not divulge a user's geolocation.

42. Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting, particularly when combined with other tracking identifiers and third-party enrichment.

43. A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing

communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

44. As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

45. Defendant installs Trackers on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

**3. *The Use of Pixel Trackers or Beacons and Digital Fingerprinting***

46. Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.

47. This process, known as digital fingerprinting, involves compiling various data points, such as browser version, screen resolution, installed fonts, device type, and language settings, to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

48. When combined with additional tracking mechanisms, such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences,

and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint, especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases, can enable the reidentification of a user.

49. The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

50. In simpler terms, pen register and trap and trace mechanisms in the digital context refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded or injected in the Website, which operate without user interaction or visibility.

51. The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

52. When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across

future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

**4. *Plaintiff's And Class Members' Data Has Financial Value***

53. Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[1]

54. Consumers' web browsing histories have an economic value more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[2]

55. There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[3]

56. Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[4]

57. In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S.

---

[1] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444

[2] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

[3] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

[4] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data

dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[5]

58. The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[6]

59. The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

***5. Defendant Is Motivated To Monetize Consumer Information Regardless of Consent***

60. Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

---

[5] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[6] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

61. By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to users who showed purchase intent, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

62. Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data—such as IP address, device type, screen resolution, and referral information—to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite private implications to users.

63. IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP

addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

64. When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device IDs, and cookies with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

**6. *The Trackers Function Together to Achieve Targeted Objectives***

65. When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

66. On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

67. On the Website, a coordinated network of third-party trackers is used to support VIATOR's goals of identity resolution, targeted advertising, and data monetization. At the center of this system is Google Tag Manager, which acts as the

command hub for deploying and managing other trackers. Google Tag Manager is automatically triggered during the initial page load and executes JavaScript code that dynamically injects scripts from third parties such as Facebook, TikTok, Criteo, AppNexus, The Trade Desk, Tapad, and PubMatic. This infrastructure enables the collection and dissemination of user behavior data in real time.

68. Identity resolution on the Website is primarily facilitated through the interplay of the Facebook Tracker, TikTok Tracker, and Tapad Tracker. The Facebook Tracker identifies users by linking on-site activity to existing Facebook cookies or logged-in sessions, enabling the correlation of behavior with social media identities. The TikTok Tracker collects device-level data and leverages browser fingerprinting and cookie-based identifiers to associate user activity with profiles on the TikTok platform. The Tapad Tracker specializes in cross-device identity resolution, assigning persistent identifiers that enable the recognition of users across sessions, devices, and browsing environments. These combined technologies allow VIATOR to de-anonymize users over time, associate behaviors with real-world identities, and build detailed demographic and behavioral profiles.

69. Once identity signals are gathered, targeted advertising and data monetization are executed through Criteo, AppNexus, The Trade Desk, and PubMatic. These entities participate in real-time bidding (RTB) and programmatic ad exchanges, enabling VIATOR to auction access to users based on behavioral and identity-linked data. Criteo leverages predictive modeling and past user interactions to deliver personalized retargeting. AppNexus and The Trade Desk serve as key conduits for audience-based ad buying, facilitating real-time audience segmentation and targeting across multiple platforms. PubMatic functions as a supply-side platform (SSP), helping to manage and monetize VIATOR’s ad inventory while syncing user identifiers with demand-side partners. Altogether, this system allows VIATOR to convert user attention into measurable marketing outcomes and revenue through identity-based advertising.

/ /

70. Defendant shares User Information with third-party advertising platforms, including AppNexus, Criteo, and PubMatic. These companies participate in real-time bidding systems that sell ad space to the highest bidder using data collected from users during their visit to the Website. When a user loads the Website, information is transmitted immediately to these advertising platforms without any action or consent from the user. This includes the user's internet protocol address, device and browser characteristics, and the specific URL of the page being visited. These data points allow third-party advertisers to profile users and target them with precision, even if they take no further action on the Website.

71. Defendant communicates with known header bidding exchanges such as Criteo, AppNexus, and Teads.tv. This indicates that Defendant uses a header bidding system, a method that offers each ad space to multiple advertising partners simultaneously. Header bidding is designed to increase revenue by forcing advertisers to compete for user attention in real time. Defendant collects and shares user data with these exchanges and delivers the winning advertisement, generating revenue based on impressions, views, or clicks. These data transfers serve no purpose for the user and exist solely to support Defendant's advertising business. By monetizing user behavior through third-party bidding systems, Defendant treats personal data as a tradable commodity.

## V. SPECIFIC ALLEGATIONS

### *1. Criteo Tracker*

72. The Criteo Tracker is a behavioral tracking script employed via domains such as static.criteo.net and dis.criteo.com. On the Website, the Criteo Tracker is embedded directly through a JavaScript snippet. Once loaded, it initiates communication with Criteo's servers and enables real-time tracking of user activity.

73. Once the user loads a page, the Criteo Tracker executes automatically, capturing information such as page views, product interest, clickstream behavior, and session context. These interactions are sent back to Criteo's servers and associated with

the user through cookie-based identifiers even if the user never directly interacts with Criteo while on the Website.

74. The data collected by the Criteo Tracker supports identity resolution by linking behavioral data from the Website with persistent user profiles across Criteo's partner network. Criteo uses first- and third-party cookies, ID syncing, and fingerprinting to associate on-site behavior with a pseudonymous identity that can be matched across multiple websites. This enables Criteo to build robust behavioral profiles that support personalized retargeting and advertising optimization.

75. The Criteo Tracker also serves VIATOR's goal of targeted advertising by enabling the creation of dynamic retargeting pools, groups of users who have demonstrated specific purchase intent or browsing behavior. Criteo enables VIATOR to leverage Criteo's ad exchange relationships to re-target those users with tailored ads as they navigate other websites, or to reach lookalike users with similar behavioral characteristics. This capability allows VIATOR to extend its marketing reach far beyond its own domain and to influence consumers across the broader internet.

76. The Criteo Tracker contributes to VIATOR's data monetization strategy by turning behavioral signals into actionable audience segments. By tracking users across pages and sessions, Criteo provides VIATOR with real-time insights into browsing intent, abandonment patterns, and advertising effectiveness. The Criteo Tracker enables VIATOR to bid in real time on user impressions through programmatic ad exchanges, increasing the value of its audience data and improving ad campaign ROI. In this way, the Criteo Tracker functions as a core component of VIATOR's behavioral surveillance architecture, facilitating real-time profiling, predictive modeling, and monetization of user behavior.

77. ***Figure 2*** below is a screenshot from the Website, confirming that the Criteo Tracker script was loaded immediately upon visiting the homepage. A GET request to criteo-sync.teads.tv, was triggered by a script embedded or injected during the initial page load. The request successfully returned a 200 OK status and includes

no-cache headers, confirming that user data was transmitted to Criteo's servers. This communication occurred automatically, without any user interaction, and reflects active behavioral tracking initiated at the outset of the user's session on VIATOR's website.

***Figure 2***




78. ***Figure 3*** below is a screenshot of network activity on the Website, confirming the presence of DNS queries to Criteo's tracking domains (e.g., criteo-sync.teads.tv and criteo-partners.tremorhub.com). These lookups reflect the user's browser attempting to resolve Criteo-controlled domains immediately upon accessing the site. This confirms that the Criteo Tracker was operational at the outset of the session and had initiated contact with Criteo's infrastructure. Criteo is known to collect browsing history to enable behavioral advertising. When this tracking begins before a user affirmatively opts in, it constitutes a textbook example of unauthorized surveillance under privacy and consumer protection laws. The DNS traffic shown here provides technical confirmation that the Criteo Tracker was already engaged in third-party data collection while the user was still on the homepage of VIATOR's website.

/ /

***Figure 3***




79. Defendant surreptitiously installed, executed, embedded, or injected the Criteo Tracker by inserting Criteo's JavaScript pixel either directly into the Website's source code or through a tag manager like Google Tag Manager. Upon loading the page, the user's browser automatically executes this script, triggering communication with Criteo's servers and transmitting metadata such as the user's page URL, browser details, and session context. This occurs without any user engagement, making the tracking behavior silent and involuntary from the user's perspective.

80. The Criteo Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

81. The Criteo Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

82. The Criteo Tracker captures and transmits routing, addressing, and signaling information, such as the user's IP address, page URL, referrer, and browser metadata, to Criteo's servers the moment a page loads, often without the user's knowledge or consent. This type of metadata identifies the origin and destination of an

electronic communication. Critically, the user is not attempting to communicate with Criteo; the connection is silently triggered by code embedded in the website, enabling Criteo to intercept and persistently associate the user's behavioral signals with a known or inferred identity, enabling commercial surveillance through passive third-party data collection. The transmission occurs while the communication is in transit, before it is received by its intended destination, and is diverted to Criteo without user authorization. This includes device-specific characteristics such as screen resolution, operating system, browser language, and previously visited URLs (via the referrer header), which Criteo uses to further fingerprint and identify users.

83. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Criteo Tracker on Plaintiff's and Class Members' browser or to collect or share data with Criteo.

84. Consequently, the Criteo Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

***2. The AppNexus Tracker***

85. The AppNexus Tracker is a behavioral tracking script employed via domains such as ib.adnxs.com and secure.adnxs.com. On the Website, the AppNexus Tracker is embedded directly through a JavaScript snippet. Once loaded, it initiates communication with AppNexus's servers and enables real-time tracking of user activity.

86. Once the user loads a page, the AppNexus Tracker executes automatically, capturing information such as page views, product interest, clickstream behavior, and session context. These interactions are sent back to AppNexus's servers and associated with the user through cookie-based identifiers even if the user never directly interacts with AppNexus while on the Website.

87. The data collected by the AppNexus Tracker supports identity resolution by linking behavioral data from the Website with persistent user profiles across

AppNexus's partner network. AppNexus uses first- and third-party cookies, ID syncing, and fingerprinting to associate on-site behavior with a pseudonymous identity that can be matched across multiple websites. This enables AppNexus to build robust behavioral profiles that support personalized retargeting and advertising optimization.

88. The AppNexus Tracker also serves VIATOR's goal of targeted advertising by enabling the creation of dynamic retargeting pools, groups of users who have demonstrated specific purchase intent or browsing behavior. AppNexus enables VIATOR to leverage AppNexus's ad exchange relationships to re-target those users with tailored ads as they navigate other websites, or to reach lookalike users with similar behavioral characteristics. This capability allows VIATOR to extend its marketing reach far beyond its own domain and to influence consumers across the broader internet.

89. The AppNexus Tracker contributes to VIATOR's data monetization strategy by turning behavioral signals into actionable audience segments. By tracking users across pages and sessions, AppNexus provides VIATOR with real-time insights into browsing intent, abandonment patterns, and advertising effectiveness. The AppNexus Tracker enables VIATOR to bid in real time on user impressions through programmatic ad exchanges, increasing the value of its audience data and improving ad campaign ROI. In this way, the AppNexus Tracker functions as a core component of VIATOR's behavioral surveillance architecture, facilitating real-time profiling, predictive modeling, and monetization of user behavior.

90. ***Figure 4*** below is a screenshot from the Website, confirming that the AppNexus Tracker script was loaded immediately upon visiting the homepage. A GET request to ib.adnxs.com, was initiated by JavaScript code embedded in or injected into the Website. The request includes parameters tied to AppNexus's identifier syncing infrastructure (ttd_td_id, anid, and UID) and received a 302 Found status code, reflecting a redirection to a tracking endpoint. This communication occurred without any user interaction and demonstrates that the AppNexus Tracker was actively

collecting identifier and session data from the moment the user accessed VIATOR's homepage.

***Figure 4***




91. Defendant surreptitiously installed, executed, embedded, or injected the AppNexus Tracker by inserting AppNexus's JavaScript pixel either directly into the Website's source code or through a tag manager like Google Tag Manager. Upon loading the page, the user's browser automatically executes this script, triggering communication with AppNexus's servers and transmitting metadata such as the user's page URL, browser details, and session context. This occurs without any user engagement, making the tracking behavior silent and involuntary from the user's perspective.

92. The AppNexus Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

/ /

/ /

93. The AppNexus Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

94. The AppNexus Tracker captures and transmits routing, addressing, and signaling information such as the user's IP address, page URL, referrer, and browser metadata to AppNexus's servers the moment a page loads, often without the user's knowledge or consent. This type of metadata identifies the origin and destination of an electronic communication. Critically, the user is not attempting to communicate with AppNexus; the connection is silently triggered by code embedded in the website, enabling AppNexus to intercept and persistently associate the user's behavioral signals with a known or inferred identity, enabling commercial surveillance through passive third-party data collection. The transmission occurs while the communication is in transit, before it is received by its intended destination, and is diverted to AppNexus without user authorization. This includes device-specific characteristics such as screen resolution, operating system, browser language, and previously visited URLs (via the referrer header), which AppNexus uses to further fingerprint and identify users.

95. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the AppNexus Tracker on Plaintiff's and Class Members' browser or to collect or share data with AppNexus.

96. Consequently, the AppNexus Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

***3. The Trade Desk Tracker***

97. The Trade Desk Tracker, typically delivered via the domain adsrvr.org, is a third-party behavioral tracking pixel. On the VIATOR website, this tracker is either embedded directly or injected dynamically through a tag management system. When a user visits the site, the tracker initiates a connection to The Trade Desk's servers,

capturing a range of data points including IP address, device type, browser version, geolocation, and unique cookie or device identifiers. These interactions confirm that the user's activity is being observed and recorded for later use in digital advertising campaigns.

98. Once activated, the Trade Desk Tracker plays a central role in identity resolution by assigning users a persistent identifier that can be recognized across other websites, apps, and devices. This is accomplished through techniques such as cookie syncing, hashed email matching, and participation in the Trade Desk's Unified ID 2.0 (UID2) system, an identity framework designed to replace third-party cookies. These tools allow The Trade Desk to connect behavioral data collected on VIATOR's site with broader user profiles across the internet, creating a cohesive view of an individual's online behavior even when they are not logged in.

99. In terms of targeted advertising, the Trade Desk Tracker enables VIATOR to reach users who previously visited the Website, viewed financial products, or began applications through retargeting ads served across thousands of partner websites and ad exchanges. The Trade Desk Tracker's data enrichment tools allow VIATOR to identify behavioral traits and interests among their site visitors, and then build lookalike audiences composed of similar users for future ad campaigns. This significantly enhances VIATOR's ability to reach new but relevant users who are likely to be interested in its financial services.

100. The Trade Desk Tracker supports VIATOR's broader objective of data monetization by transforming real-time behavioral signals into actionable, revenue-generating insights. By tracking users across multiple touchpoints and matching them to advertising segments, VIATOR gains access to detailed performance analytics and the ability to optimize ad spend. The data collected feeds into a programmatic ad-buying ecosystem where advertisers compete to show personalized ads to high-value users often based on the very behavioral traits observed on VIATOR's site. In this way, The

Trade Desk enables VIATOR to extract commercial value from user activity, while facilitating profiling and ad delivery practices.

101. ***Figure 5*** below is a screenshot from the Website, confirming that The Trade Desk Tracker script was loaded immediately upon visiting the homepage. A GET request to js.adsrvr.org, was initiated by JavaScript code embedded in or injected into the Website. The request returned a 200 OK status, indicating that the tracker successfully communicated with The Trade Desk's servers. This interaction occurred automatically, without any user interaction, and confirms that The Trade Desk Tracker was actively transmitting session metadata at the outset of the user's visit to VIATOR's website.

***Figure 5***




102. ***Figure 6*** below is a screenshot of website activity on the Website, which reflects a DNS query and corresponding response for js.adsrvr.org, a domain controlled by The Trade Desk. This activity confirms that the user's browser initiated a request to resolve The Trade Desk's tracking domain during the session, prior to any user interaction. The DNS resolution process is a prerequisite for communication with

remote servers and reflects an attempt to establish a tracking connection. This behavior supports the conclusion that The Trade Desk Tracker was operational and that the browser was actively transmitting routing and signaling metadata to a third-party server controlled by The Trade Desk.

***Figure 6***




103. Defendant surreptitiously installed, executed, embedded or injected The Trade Desk Tracker onto users' browsers by copying the JavaScript code snippet and adding it to the Website. When a user visits the Website, their browser executes the JavaScript code which sends data about the user's interactions, including the user's IP address, to Trade Desk's servers.

104. The Trade Desk Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

105. The Trade Desk Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

/ /

106. The Trade Desk Tracker initiates a connection to its ad infrastructure upon page load via a script or pixel execution. It captures user metadata such as IP address, page path, timestamp, and unique identifiers, all of which qualify as routing or signaling information under CIPA.

107. The user is not intentionally initiating any communication with The Trade Desk; rather, the connection is automatically triggered in the background by embedded third-party code. As a result, The Trade Desk is able to silently intercept, and log communication-related data generated during the user's interaction with the Website. In this way, the Trade Desk Tracker functions as a surveillance mechanism that captures third-party signaling information.

108. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install The Trade Desk Tracker on Plaintiff's and Class Members' browser or to collect or share data with The Trade Desk.

109. Consequently, The Trade Desk Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

***4. The Tapad Tracker***

110. The Tapad Tracker is a behavioral tracking script employed via domains such as tapestry.tapad.com. On the Website, the Tapad Tracker is embedded directly or dynamically injected through tag management infrastructure. When the user visits the site, the tracker automatically initiates communication with Tapad's servers and begins collecting behavioral metadata and technical identifiers in real time.

111. Once triggered, the Tapad Tracker captures user information such as IP address, device type, browser characteristics, and session timestamps. These details are sent to Tapad's tracking infrastructure and associated with persistent identifiers that Tapad maintains across its partner network. The tracker operates in the background without the user's awareness or any direct interaction.

112. The Tapad Tracker plays a central role in identity resolution through its proprietary device graph, which enables recognition of individual users across devices and platforms. Tapad leverages probabilistic and deterministic matching techniques including IP-based correlation, user agent analysis, and shared identifier syncing to build cross-device profiles. These capabilities allow Tapad to associate activity on VIATOR's website with user behavior across a wide range of other contexts.

113. The Tapad Tracker also enables VIATOR to engage in precise audience targeting by feeding identity-linked data into demand-side platforms (DSPs) and ad exchanges. This infrastructure supports retargeting of users who previously interacted with VIATOR content, and the construction of lookalike audiences with similar behavioral patterns. Tapad's enrichment capabilities help VIATOR reach high-value consumers across the open web with data-driven marketing strategies.

114. The Tapad Tracker contributes to VIATOR's data monetization strategy by translating user activity into persistent identity signals and advertising value. Tapad's integration into the programmatic advertising ecosystem allows VIATOR to extract value from behavioral data through real-time bidding, cross-device attribution, and segment construction. In this way, the Tapad Tracker functions as a silent but integral part of VIATOR's commercial surveillance infrastructure.

115. ***Figure 7*** below is a screenshot from the Website, confirming that the Tapad Tracker script was triggered automatically upon page load. A GET request to pixel.tapad.com was initiated by JavaScript code embedded in or injected into the Website and contains query parameters referencing a partner sync with Snapchat and identifiers like partner_id, pnid, and device_id. The request returned a 302 Found status code, indicating redirection to a tracking endpoint controlled by Tapad. This request occurred prior to user consent and without any user interaction, confirming that Tapad's identifier synchronization infrastructure was active during the user's initial session on VIATOR's homepage.

/ /

*Figure 7*




116. *Figure 8* below is a screenshot of network activity on the Website, which captures a DNS query and corresponding response for pixel.tapad.com, a domain controlled by Tapad. The user's browser issued this request during the initial session load, prior to any user interaction. The DNS response confirms that Tapad's tracking infrastructure was contacted as part of the Website's background operations. This exchange occurred passively, without the user's knowledge, and confirms that VIATOR's site established a connection with Tapad for purposes of third-party tracking and data collection.

/ /

/ /

/ /

/ /

/ /

/ /

***Figure 8***




117. Defendant surreptitiously installed, executed, embedded, or injected the Tapad Tracker onto users' browsers by deploying JavaScript code sourced from Tapad-controlled domains or loaded through tag management infrastructure. When a user visits VIATOR's site, their browser automatically executes this script, resulting in the transmission of metadata including page URL, device profile, and session data to Tapad's servers, all without any user consent or interaction.

118. The Tapad Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

119. The Tapad Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. *See*, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

120. The Tapad Tracker captures and transmits routing, addressing, and signaling information — such as the user's IP address, referrer, page URL, and device metadata to Tapad's servers during the initial page load. This data identifies the origin and destination of the user's online communication. The user does not intend to

communicate with Tapad; the exchange is initiated silently by third-party code embedded in VIATOR's website, allowing Tapad to intercept the user's session activity without notice or authorization.

121. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Tapad Tracker on Plaintiff's and Class Members' browser or to collect or share data with Tapad.

122. Consequently, the Tapad Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

***5. The PubMatic Tracker***

123. The PubMatic Tracker is a behavioral advertising and identity-syncing script typically delivered via domains such as simage2.pubmatic.com and ads.pubmatic.com. On the Website, the PubMatic Tracker is injected during the initial page load through tag management infrastructure or embedded JavaScript. Once executed, the tracker immediately initiates communication with PubMatic's servers to collect user and session-level metadata.

124. Once triggered, the PubMatic Tracker captures information including IP address, page URL, browser type, and unique identifier cookies. This data is transmitted to PubMatic's real-time bidding infrastructure, where it can be associated with advertising demand partners and auction participants. These network calls occur passively, without any action or indication to the user, confirming that PubMatic's tracking system is operating silently during the user's visit to VIATOR's website.

125. The PubMatic Tracker plays a core role in identity resolution by enabling cookie syncing across demand-side platforms (DSPs), supply-side platforms (SSPs), and data brokers. When embedded on VIATOR's site, the tracker facilitates persistent user recognition across partner websites, allowing PubMatic to contribute identity-linked behavioral signals to broader advertising profiles. This technology underpins user fingerprinting and attribution across devices and browsing sessions.

126. The PubMatic Tracker also serves VIATOR's targeted advertising strategy by exposing user behavioral signals to advertisers in real time through programmatic exchanges. It allows VIATOR to retarget site visitors, construct lookalike audiences, and auction user impressions to the highest bidder across connected ad platforms. These capabilities enhance VIATOR's ability to monetize its audience and improve advertising efficiency through granular user segmentation.

127. The PubMatic Tracker contributes to VIATOR's broader data monetization strategy by transforming page-level behavioral interactions into revenue-generating insights. Through PubMatic's SSP and exchange infrastructure, VIATOR can leverage real-time ad targeting, yield optimization, and segment performance analytics, all made possible by behavioral telemetry gathered from the user during their visit to the site.

128. ***Figure 9*** below is a screenshot from the Website, confirming that the PubMatic Tracker script was triggered automatically upon visiting the homepage. A GET request to simage2.pubmatic.com was initiated by JavaScript code embedded in or injected into the Website and includes query parameters referencing a user ID cookie (uid) and a piggyback call structure consistent with identity syncing. The request returned a 200 OK status, confirming successful communication with PubMatic's tracking infrastructure. This activity occurred prior to any user interaction, verifying that the PubMatic Tracker was active during the user's initial session on VIATOR's website.

/ /

/ /

/ /

/ /

/ /

/ /

***Figure 9***




129. ***Figure 10*** below is a screenshot of network activity on the Website, capturing a DNS query and corresponding response for simage2.pubmatic.com, a domain operated by PubMatic. This DNS transaction occurred during the initial session load and confirms that VIATOR's Website initiated a connection with PubMatic's tracking infrastructure prior to any user interaction. The DNS request and response reflect backend communication processes consistent with third-party tracking operations and underscore that the PubMatic Tracker was silently activated in the background.

/ /

/ /

/ /

/ /

/ /

/ /

***Figure 10***




130. Defendant surreptitiously installed, executed, embedded, or injected the PubMatic Tracker onto users' browsers by deploying JavaScript code either directly into VIATOR's source code or through third-party tag orchestration tools. When the page loads, the user's browser executes this code automatically, resulting in the collection and transmission of behavioral and technical metadata to PubMatic. This occurs without any disclosure or consent, and the user is not provided an opportunity to prevent this background tracking.

131. The PubMatic Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

132. The PubMatic Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. *See*, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

133. The PubMatic Tracker captures and transmits routing, addressing, and signaling information such as page URL, referrer, user agent, and behavioral metadata to PubMatic's servers as soon as the Website loads. This data qualifies as

communication metadata under CIPA and is transmitted without user direction or awareness. The browser's silent execution of third-party JavaScript causes outbound transmissions to PubMatic, enabling the company to intercept and use user data before it reaches its intended destination (VIATOR).

134. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the PubMatic Tracker on Plaintiff's and Class Members' browser or to collect or share data with PubMatic.

135. Consequently, the PubMatic Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

***6. The Facebook Tracker***

136. The Facebook Tracker is a behavioral tracking script implemented through Meta's Pixel technology, typically delivered via domains such as connect.facebook.net and facebook.com/tr/. On the Website, the Facebook Tracker is embedded directly into the page code or injected through tag management infrastructure. Once loaded, it initiates background communication with Meta's servers and enables real-time tracking of user activity.

137. Once the user loads a page, the Facebook Tracker executes automatically, capturing interaction data such as page views, button clicks, form interactions, and scroll behavior. These signals are sent to Meta's servers and associated with the user's Facebook or Instagram profile even if the user never directly interacts with any Meta service while on the Website.

138. The data collected by the Facebook Tracker supports identity resolution by linking behavioral data from the Website with individual user profiles across Meta's platforms. If the user is logged into Facebook, Instagram, or Messenger on the same device or browser, the Facebook Pixel can tie Website behavior to the user's unique Meta ID. Even if not logged in, Meta can assign a persistent identifier using cookies,

browser fingerprinting, or pixel fire data. This enables the creation of robust cross-site behavioral profiles based on a user's activity on VIATOR's website.

139. The Facebook Tracker also serves VIATOR's goal of targeted advertising by enabling the creation of "Custom Audiences,"groups of users who have taken specific actions on the Website, such as browsing destinations, viewing travel packages, or beginning a booking process. VIATOR can then use Meta's Ads Manager to re-target those users across Facebook and Instagram, or to generate "Lookalike Audiences" that mirror the behavioral patterns of existing visitors. These mechanisms allow VIATOR to efficiently deliver marketing content to users most likely to engage or convert.

140. The Facebook Tracker contributes to VIATOR's data monetization strategy by turning behavioral insights into measurable advertising ROI. Meta provides VIATOR with real-time analytics regarding user behavior, campaign performance, and conversion attribution. The Facebook Tracker enables a closed-loop feedback system that connects on-site engagement with off-site ad delivery, allowing VIATOR to refine ad spend, personalize messaging, and increase the value of each user interaction. In this way, the Facebook Tracker functions as a core part of VIATOR's commercial surveillance infrastructure.

141. ***Figure 11*** below is a screenshot from the Website, confirming that the Facebook Tracker script was triggered automatically upon visiting the homepage. A GET request to connect.facebook.net was initiated by JavaScript code embedded in or injected into the Website and delivers Meta's Pixel tracking script. The request returned a 200 OK status, indicating successful communication with Meta's tracking infrastructure. This occurred before any user interaction, confirming that the Facebook Tracker was actively collecting behavioral data during the initial homepage session on VIATOR's site.

/ /

***Figure 11***




142. ***Figure 12*** below is a screenshot of network activity on the Website, capturing a DNS query and corresponding response for connect.facebook.net. This confirms that VIATOR's Website resolved Meta's tracking domain during the user's session on the homepage. The query was initiated automatically and invisibly, without any user interaction or awareness, illustrating that the Facebook Tracker was silently active as part of the site's background communication infrastructure.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

*Figure 12*




143. Defendant surreptitiously installed, executed, embedded, or injected the Facebook Tracker onto users' browsers by inserting Meta's JavaScript pixel either directly into the Website's source code or through a tag manager like Google Tag Manager. Upon loading the page, the user's browser automatically executes this script, triggering outbound communication with Meta's servers and transmitting metadata such as the user's page URL, referrer, browser configuration, and other session attributes. This occurs without any user engagement, making the tracking behavior silent and involuntary from the user's perspective.

144. The Facebook Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

145. The Facebook Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

146. The Facebook Tracker captures and transmits routing, addressing, and signaling information such as the user's page URL, referrer, and browser metadata to

Meta's servers as soon as the page loads, often without the user's knowledge or consent. This type of metadata reveals the origin and destination of the user's electronic communications. The connection is not initiated by the user, but rather by code embedded in the website, allowing Meta to intercept and associate those signals with a known or inferred identity. The transmission occurs while the user's communication is still in transit and is diverted to Meta without authorization.

147. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Facebook Tracker on Plaintiff's and Class Members' browser or to collect or share data with Facebook.

148. Consequently, the Facebook Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

***7. The TikTok Tracker***

149. The TikTok tracker is a piece of software code that Defendant placed on its Website that allows Defendant to share Website events with TikTok.

150. TikTok tracker's tracking mechanisms, including its use of pixels, collect and process user data in real-time and track user interactions, such as page visits and actions taken on those pages. It is designed to analyze Website data and marketing campaigns, conduct targeted advertising, and boost revenue through the surreptitious collection of Plaintiff's and Class Members' data.

151. The TikTok tracker begins to collect information the moment a user lands on the Website and immediately starts sending information to TikTok regarding the user's visit. The TikTok Tracker gathers device and browser information, geographic information, referral tracking, and URL tracking by running software code on the Website to send user details to TikTok. TikTok acknowledges that the TikTok tracker automatically collects Plaintiff and Class Members' IP address and sends that

information to TikTok.[7]

152. ***Figure 13*** below is a screenshot from the Website, confirming that the TikTok Tracker script was triggered automatically upon visiting the homepage. A request to analytics.tiktok.com was initiated by JavaScript code embedded in or injected into the Website, indicating that TikTok's tracking infrastructure was activated to collect pixel event data. This request occurred prior to any user interaction, confirming that the TikTok Tracker was actively collecting behavioral data during the initial session on VIATOR's homepage.

***Figure 13***




153. ***Figure 14*** below is a screenshot of network activity on the Website, capturing a DNS query and corresponding response for analytics.tiktok.com. This confirms that VIATOR's Website resolved TikTok's tracking domain during the user's homepage session. The DNS request was automatically triggered without any user interaction, reflecting background communication that enabled TikTok's tracking

[7] https://ads.tiktok.com/help/article/tiktok-pixel?q=tiktok%20pixel&redirected=1

infrastructure to activate silently in the user's browser.

***Figure 14***




154. The collection of Plaintiff's and Class Members' personally identifying and/or non-anonymized information through Defendant's installation and use of the TikTok tracker constitutes an invasion of privacy and violates CIPA. Cal. Penal Code § 638.51(a).

155. According to a leading data security firm, the TikTok tracker secretly installed on Defendant's website is particularly invasive. The Tik Tok tracker "immediately links to data harvesting platforms that pick off usernames and passwords, credit card and banking information and details about users' personal health." The pixel also collects "names, passwords and authentication codes" and "transfer the data to locations around the globe, including China and Russia", and does so "before users have a chance to accept cookies or otherwise grant consent."[8]

---

[8] Aaron Katersky, TikTok Has Your Data Even If You've Never Used The App: Report, ABC News (last accessed October 2024), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249

156. The TikTok tracker runs on virtually every page of Defendant's Website, sending to TikTok information regarding the Website user's interest in Defendant's products and/or services.

157. The Website instantly sends communications to TikTok when a user lands on the Website and when a user clicks on links to various pages contained within the Website.

158. The TikTok tracker provides an optional feature called Auto Advanced Matching that automatically identifies and captures customer information (such as email addresses and phone numbers) from form fields on web pages where the TikTok tracker is installed. This information is matched with TikTok users to enhance ad targeting and attribution.

159. Auto Advanced Matching is an optional TikTok feature designed to enhance the accuracy of user identification and ad targeting by capturing user information such as email addresses and phone numbers from form fields on websites where the TikTok tracker is installed. When a user inputs their information on a website with the pixel, Auto Advanced Matching identifies and captures the data from form fields, transferring it to TikTok via HTTPS and matching it with users on the platform to optimize ad campaigns and improve attribution of events to TikTok ads.

160. Defendant has implemented Auto Advanced Matching on the Website. With Auto Advanced Matching implemented, the TikTok tracker scans the user's interaction with the Website for information, such as name, phone number and address, and simultaneously sends the information to TikTok to isolate with certainty the individual to be targeted, including Plaintiff and the Class Members.

161. By sharing Plaintiff's and Class Members' personal and de-anonymized data with TikTok, Defendant effectively "doxed" them to America's most formidable geopolitical adversary without informing them that the Website is collaborating with the Chinese government to obtain their identifying information. By sharing Plaintiff's and Class Members' personal and de-anonymized data with TikTok, Defendant

effectively "doxed" them to America's most formidable geopolitical adversary. There is evidence that sharing data with TikTok, whose parent company ByteDance, has drawn national security scrutiny. Former employees have testified that data stored on TikTok systems was accessible by ByteDance staff in China.

162. The TikTok tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

163. The TikTok tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. *See*, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

164. The TikTok tracker functions as a pen register or trap and trace device because it is designed to capture and transmit addressing, signaling, and routing information associated with a user's interactions on a website, including such information as page URLs, video identifiers, device and browser metadata, IP address, click paths, scroll depth, and session timestamps. This data reveals the origin and destination of electronic communications, closely analogous to how a traditional pen register captures dialed numbers and a trap and trace device records incoming call data. By systematically logging which content the user accessed (i.e., the "addressed" destination), the technical attributes of the user's system (i.e., the "signaling"), and the communication route (i.e., IP routing and timestamps), the TikTok tracker enables TikTok to identify patterns of communication behavior, monitor content consumption in real time, and attribute it to specific individuals or devices.

165. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the TikTok Tracker on Plaintiff's and Class Members' browser or to collect or share data with TikTok.

166. Consequently, the Defendant's secret installation of the TikTok tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

## VI. CLASS ALLEGATIONS

167. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period.

168. **NUMEROSITY:** Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

169. **COMMONALITY:** Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded or injected the Trackers on the Website;
- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;
- Whether Plaintiff and Class Members are subject to same tracking policies and practices;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained;
- Whether the Defendant's conduct violates the Cal. Civil Code § 1798.100, *et seq.;*
- Whether the Defendant's conduct violates CIPA; and

- Whether the Defendant's conduct constitutes an unlawful, misleading, deceptive or fraudulent business practice.

170. **TYPICALITY:** As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

171. **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

172. **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## VII. FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 638.51

***By Plaintiff and the Class Members Against All Defendants***

173. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

174. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

175. Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

/ /

176. Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

## VIII. SECOND CAUSE OF ACTION

### Violations of Cal. Civil Code § 1798.100, *et seq.*

### *By Plaintiff and the Class Members Against All Defendants*

177. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

178. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

179. The CCPA grants consumers legal rights subject to statutory protection, including the right to know what personal information is being collected about them and whether that information is sold or disclosed and to whom, the right to prohibit the sale of their personal information, the right to request deletion of their personal information, and the right to nondiscrimination in service and price when they exercise privacy rights. Ca. Civil Code § 1798.100 *et seq*.

180. The CCPA defines "personal information" broadly to include "...information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." Cal. Civil Code § 1798.140.

181. The CCPA dictates specifically that "[a] third party shall not sell or share personal information about a consumer that has been sold to, or shared with, the third party by a business unless the consumer has received explicit notice and is provided an opportunity to exercise the right to opt-out." Cal. Civil Code § 1798.115.

182. Defendant collected Plaintiff's and Class Members' personal information

with the purpose of resolving their identities and locating them for targeted marketing in the course of and as part of its business with California consumers.

183. Defendant has violated California Civil Code § 1798.100(b) by failing to provide notice "at or before" collection of personal information.

184. Defendant has violated California Civil Code § 1798.120(a) by failing to provide consumers the ability to opt out before sharing their personal information including for cross-contextual behavioral advertising purposes.

185. Defendant has violated California Civil Code § 1798.135(a)(1) by failing to provide a "Do Not Sell or Share My Personal Information" link on the homepage of the Website.

186. Defendant has violated California Civil Code section 1798.100(c) by collecting and disclosing personal information including identifiers, online activity, and inferences for purposes that were neither necessary nor proportionate to achieve any disclosed, reasonably expected, or operationally required use of the Website.

187. Defendant has violated California Civil Code section 1798.115(d) by disclosing personal information to third parties including behavioral advertising networks, data brokers, and cross context advertising intermediaries without binding those recipients to contracts that limit their use of the data to specified purposes consistent with the original collection.

188. Defendant has violated California Civil Code section 1798.130(a)(5)(A) by failing to provide accurate, clear, and accessible notice at the point of collection that identifies all categories of third parties with whom personal information is shared and all purposes for such sharing.

189. Disclosing Plaintiff's and Class Members' personal information was not reasonably necessary or proportionate to perform Defendant's reasonably expected online services.

190. By collecting, using, and/or selling Plaintiff's and Class Members' personal information and location data to Third Parties without providing sufficient

notice, Defendant violated CCPA.

191. By failing to inform Plaintiff and Class Members of the personal information collected about them and that their personal information was shared with the Third Parties, Defendant violated CCPA.

192. On May 29, 2025, Plaintiff provided Defendant with written notice pursuant to California Civil Code § 1798.150(b), identifying the specific provisions of the CCPA that Defendant violated. The letter was sent on behalf of Plaintiff and all others similarly situated.

193. Plaintiff, on behalf of himself and the Class Members, hereby seeks injunctive relief and statutory damages pursuant to California Civil Code § 1798.150.

## IX. THIRD CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

***By Plaintiff and the Class Members Against All Defendants***

194. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

195. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

196. This cause of action is brought under California Business & Professions Code § 17200 et seq., which prohibits any unlawful, unfair, or fraudulent business act or practice.

197. Defendant has engaged in unlawful business practices by:

(a) Violating California Penal Code §§ 638.50–638.56, including the unauthorized collection of addressing, signaling, and routing information for user identification and tracking; and

(b) Violating California Civil Code § 1798.100, *et seq.*, including collecting, using, and/or selling Plaintiff's and Class Members' personal information and location data to Third Parties without providing sufficient notice. Privacy rights rooted in the

CCPA are a protected interest enforceable under Business & Professions Code § 17200. *Briskin v. Shopify, Inc.*, 101 F.4th 706 (9th Cir. 2025) (en banc).

198. Defendant has engaged in unfair business practices by embedding the Trackers into the Website and enabling the real-time capture and transmission of Plaintiff's and Class Members' personal and behavioral information, such as IP address, browser details, visited URLs, referrer paths, timestamps, and interaction events, to the Third Parties.

199. The Defendant's practices are contrary to public policy supporting consumer privacy and data autonomy, and the harm it causes to consumers, including loss of control over personal information and risk of profiling, outweighs any legitimate business justification.

200. Defendant has engaged in fraudulent business practices by failing to adequately disclose its data-sharing practices. On information and belief, Defendant omitted material facts from its privacy policy and/or site interface and failed to inform users that their activities would be tracked across the internet and linked to unique identifiers for advertising and profiling purposes. These omissions were likely to deceive a reasonable consumer and were intended to obscure the nature and extent of the surveillance.

201. As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct, Plaintiff and the Class Members have suffered injury in fact and loss of money or property, including the unauthorized exfiltration and commodification of valuable personal data. Plaintiff's and Class Members' data—used for targeted advertising, behavioral modeling, and enrichment by third parties—constitutes digital property with measurable economic value.

202. Plaintiff on behalf of himself and on behalf of the Class Members seeks injunctive relief to prevent Defendant from continuing its deceptive and unlawful data tracking practices and to require clear and conspicuous notice and opt-in consent for any behavioral tracking involving third-party tools. Plaintiff on behalf of himself and

on behalf of the Class Members, also seeks restitution of the value derived from the unauthorized use of their personal information, attorneys' fees where permitted by law, and such other and further relief as the Court may deem just and proper.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;
2. An order declaring that Defendant's conduct violates CIPA, the CCPA, and Business & Professions Code § 17200;
3. An order of judgment in favor of Plaintiff and the Class against Defendant on the causes of action asserted herein;
4. An order enjoining Defendant's conduct as alleged herein;
5. Statutory damages pursuant to CIPA and CCPA;
6. Prejudgment interest;
7. Reasonable attorney's fees and costs; and
8. All other relief that would be just and proper as a matter of law or equity.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so permitted.

Dated: July 10, 2025 **NATHAN & ASSOCIATES, APC**

By: /s/ Reuben D. Nathan
Reuben D. Nathan, Esq.
Attorneys for Plaintiff